## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### Indianapolis Division

| | |
|---|---|
| LAVONNA MARIE THOMPSON and | ) |
| RICKY CHESLEY THOMPSON, | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) **Case No.**   1:20-cv-1924 |
| | ) |
| SELECT PORTFOLIO SERVICING, INC., | ) |
| U.S. BANK, NA, as indenture Trustee for the | ) |
| CIM TRUST 2016-1, EQUIFAX INFORMATION | ) |
| SERVICES, LLC., TRANS UNION, LLC., and | ) |
| EXPERIAN INFORMATION SOLUTIONS, INC. | ) |
| | ) |
| *Defendants*. | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Ricky and Lavonna Thompsons (collectively, the "Thompsons" or "Thompson")

by and through undersigned counsel, complains of Defendants, Select Portfolio Servicing, Inc.

("Select" or "SPS"), U.S. Bank, NA., as indenture Trustee for the CIM Trust 2016-1 ("U.S.

Bank"), Equifax Information Services, LLC ("Equifax"), Trans Union, LLC ("Trans Union"),

and Experian Information Solutions, Inc. ("Experian"):

### PARTIES, JURISDICTION, AND VENUE

1.      The Thompsons are the owners of real property and improvements located at and

commonly known as 1440 W. Private Road 690 N., North Vernon, IN, 47265 (the "Home").

2.      The Thompsons purchased the Home on or about August 25, 1999, as their

primary, principal residence and financed that purchase by a loan as evidenced by a note (the

"Note") and a mortgage on the Home that allegedly secures the Note (the "Mortgage")

(collectively referred to hereinafter as the "Loan").

1

3.      The Loan was originated by Household Finance Corporation III, and subsequently placed in a mortgage-backed security guaranteed by Fannie Mae.

4.      Thereafter, ownership of the Note was transferred to U.S. Bank.

5.      Select is the servicer of the Loan.

6.      Select obtained servicing rights from U.S. Bank on or about September 21, 2016 at a time it believed the Loan was in default.

7.      Select is a residential loan servicing company with headquarters located at 3217 S. Decker Lake Drive, Salt Lake City, Utah 84119. As of 2017, SPS serviced more than 560,000 loans nationwide.

8.      SPS enters into service agreements with lenders, note holders and trustees pursuant to which SPS provides servicing and agency activities for loan portfolios. Pursuant to its agreements with U.S. Bank for example, SPS: (a) acts as the agent of U.S. Bank; and, (b) exercises the rights and responsibilities U.S. Bank pursuant to its approval. SPS has represented in standard, form letters to borrowers that, "[a]s the mortgage servicer, SPS is authorized to collect all payments and administer the terms of the note and security instrument."

9.      Select regularly and in the ordinary course of business furnished information to one or more consumer reporting agencies about the Thompsons' transactions and is therefore a "furnisher" as the term is used in 15 U.S.C.A. § 1681s-2.

10.     Jurisdiction of claims is conferred by 28 U.S.C. §1331 as this action arises under the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Real Estate Settlement Procedures Act, 12 U.S.C. §2601, *et seq.* ("RESPA"), the Truth In Lending Act, 15 U.S.C. § 1639 *et seq.* ("TILA"), and the Fair Debt Collection Practices Act, 15 U.S.C. §1692, *et seq.* ("FDCPA").

11.     This action is filed to enforce regulations promulgated by the Consumer Finance Protection Bureau ("CFPB") that became effective on January 10, 2014, specifically, 12 C.F.R. §1024.35 and §1024.36 of Regulation X.

12.     This Court has supplemental jurisdiction to hear all state law claims pursuant to 28 U.S.C. §1367.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the property that is the subject of the action is situated in this district.

### SUMMARY OF FEDERAL CLAIMS

<u>Claims under RESPA & Reg. X</u>

14.     RESPA, originally enacted in 1974, was designed to ensure that consumers in real estate transactions would receive timely information on the nature and costs of the settlement process and would be protected from abusive practices.

15.     The Cranston-Gonzalez National Affordable Housing Act of 1990 expanded the scope of RESPA by addressing mortgage servicer practices. These amendments to RESPA followed reports of a substantial number of consumer complaints about mortgage servicing problems.

16.     In response to evidence of additional servicer abuses during the preceding mortgage crisis, RESPA was amended in 2010 by the Dodd-Frank Act to expand some of the statute's existing servicer requirements.

17.     RESPA's provisions relating to loan servicing are to be construed liberally so as to carry out the statue's remedial consumer protection purpose.  *Medrano v. Flagstaff Bank*, 704 F.3d 661, 665 (9th Cir. 2012).

18.     On January 17, 2013, the CFPB issued the RESPA Mortgage Servicing Final Rules, 78 F.R. 10695 (Regulation X) (February 14, 2013), which became effective on January 10, 2014.

19.     The Loan in the instant matter is a "federally related mortgage loan" as said term is defined by 12 C.F.R. §1024.2(b).

20.     Select is subject to the aforesaid regulations and does not qualify for the exception for "small servicers," as such term is defined in 12 C.F.R. §1026.41(e)(4), nor the exemption for a "qualified lender," as such term is defined in 12 C.F.R. §617.700.

21.     The Thompsons assert a claim for relief against Select for violations of the specific rules under Regulation X as set forth below.

22.     The Thompsons have a private right of action under RESPA pursuant to 12 U.S.C. §2605(f) for the claimed violations and such action provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

<u>Claims under the FDCPA</u>

23.     Congress enacted the FDCPA to prohibit the "[u]se of abusive, deceptive, and unfair debt collection practices." 15 U.S.C §1692a.

24.     The FDCPA applies to debt collectors, not original creditors.  Select is a "debt collector" as defined by §1692a (6) because it obtained servicing rights to the Loan after it was in default and it uses instrumentalities of interstate commerce to conduct its business.

25.     The Thompsons are "consumers" as defined by § 1692a (3), and the Loan is a "debt" as defined by 15 U.S.C. § 1692A (4).

26.     The Thompsons assert a private right of action under the FDCPA pursuant to 15 U.S.C. §1692k for Select's willful and deliberately indifferent conduct in connection with collection of the Loan.

Claims under the TCPA

27.     The TCPA was enacted to protect individuals from the harassment, annoyance and abuse of unsolicited telephone calls made to their cellphones through the use of automatic telephone dialing systems ("ATDS") or automated/pre-recorded voices ("Robocalls").

28.     To accomplish this purpose, the TCPA authorizes a "person" to bring a private cause of action against callers who make "any call using an automatic telephone dialing system or prerecorded voice to any telephone number assigned to a ….cellular telephone..." *See* 47 U.S.C. §227(b)(1)(A)(iii).  The TCPA's definition of an automatic telephone dialing system includes a "predictive dialer." *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012).

29.     According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.  The FCC also recognized that wireless customers are charged for incoming calls whether they pay in advance or after the minutes are used.  Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-278, Report and Order, 18 FCC Rcd 14014 (2003).

30.     On January 4, 2008, the FCC issued a Declaratory Ruling confirming that autodialed calls and calls using an artificial voice or pre-recorded message to a wireless number

by a creditor or on behalf of a creditor are permitted only if the calls are made with the "prior express consent" of the called party.  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 ("FCC Declaratory Ruling"), 23 F.C.C.R. 559, 23 FCC Rcd. 559, 43 Communications Reg. (P&F) 877, 2008 WL 65485 (F.C.C.) (2008).

31.     The FCC "emphasize[d] that prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that the number was provided during the transaction that resulted in the debt owed."  FCC Declaratory Ruling, 23 F.C.C.R. at 564-65 (¶10).

32.     Under the TCPA and pursuant to the FCC's January 2008 Declaratory Ruling, the burden is on Select to demonstrate that the Thompsons gave their express consent to Select to use an autodialer to call their phones within the meaning of the statute.  *See* FCC Declaratory Ruling, 23 F.C.C.R. at 565 (¶ 10). However, even when consent is determined to have been given, it can be revoked.

33.     Directly as well as through its subsidiaries, contractors and agents, Select employs hundreds of persons at various call centers throughout the country.  These calling centers use automatic telephone dialing systems and computerized account information to track, record, and maintain the hundreds of thousands of debts collected by Select.

34.     A significant portion of Select's business operations are dedicated to servicing consumer loans that are in default, foreclosure, or were involved in a bankruptcy proceeding.

35.     Select's regular business practices include making repeated phone calls, text messages, notices, statements, and other written correspondence to persons like the Thompsons who it believes responsible for paying allegedly past due amounts.  Part of Select's strategy for servicing consumer loans involves the use of an ATDS and/or Robocalls.

36.     Select uses ATDS equipment and software that has the capacity to store or produce telephone numbers to be called and which includes auto-dialers and predictive dialers.

37.     Select has made calls and texts using an ATDS and/or Robocalls to the Thompsons' cellular telephones without express prior consent to receiving such calls and after the Thompson s revoked any alleged consent thereafter.

<u>Claims under the FCRA</u>

38.     The United States Congress has found that the banking system is dependent on fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.  Congress enacted the FCRA to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

39.     The major national CRAs – Trans Union, LLC., Equifax Information Services, LLC., and Experian Information Solutions, Inc. – also collaborated and developed a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation.  The system is commonly referred to as e-OSCAR and was designed to be Metro 2 compliant.

40.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

41.     ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their

statutory obligation to notify furnishers of disputed information of consumers' disputes.

42.     One such entity that regularly reviews consumer reports, and uses the data contained therein, is the Fair Isaac Corporation.  The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit risk scoring system, and utilizes data reported by credit reporting agencies and furnishers which are, ostensibly, in compliance with Metro 2 Standards.

43.     The cost of credit (*e.g.,* interest rates, fees, etc.), the availability of credit, and even unsolicited credit offers to refinance a mortgage at a lower interest rate, for extended financing periods, lower rate auto loans, and zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's FICO score.

44.     Inaccurate credit reporting often results in a lower FICO scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.  The improper reporting of negative mortgage information has a particularly adverse effect on a consumer's credit rating because it almost always represents the largest and longest active debt obligation in their credit history.

<u>The Thompsons' Ch. 13 Bankruptcy Proceeding</u>

45.     On August 23, 2013, the Thompsons filed for bankruptcy pursuant to Chapter 13 of the United States Bankruptcy Code on August 23, 2013, in the United States Bankruptcy Court for the Southern District of Indiana, Case No. 13-91928-BHL-13 (hereinafter the "Bankruptcy Case").

46.     On August 23, 2013, the Thompsons were current on the Loan.

47.     Shortly after filing, the Thompsons proposed a Chapter 13 Plan [<u>Filing No. 2</u>]

(the "Chapter 13 Plan"), which was confirmed after a series of amendments on March 18, 2014 [Filing No. 39].

48.     Pursuant to the Chapter 13 Plan, and because they were current on the Loan, the Thompsons were to continue making their regular monthly payments directly to Select.

49.     Household Finance Corporation III, predecessor in interest to U.S. Bank, appeared in the Bankruptcy Case and participated in those proceedings by filing a Proof of Claim (Claim No. 16 dated December 26, 2013) [Claim Filing No. 16-1] on behalf of HSBC Mortgage Services, Inc.

50.     The Proof of Claim asserted a secured claim in the amount of $82,722.26 and an "arrearage" claim of $16.58.

51.     On September 21, 2016, Select filed a Transfer Of Claim Other Than For Security [Doc. 44] notifying the Bankruptcy Court they had taken ownership of the Loan and would be servicing it going forward.

52.     The Transfer of Claim Other Than for Security makes no mention of a delinquency or need to modify the Chapter 13 Plan.

53.     By information and belief, when Select "boarded" the Loan onto its servicing system it entered an incorrect due date and failed to account for funds in suspense.

54.     The Thompsons made timely and adequate monthly installment payments on the Loan throughout the duration of the Bankruptcy Case.

55.     On November 21, 2018, an Order of Discharge was issued.

56.     Per the Chapter 13 Plan and the Order of Discharge their mortgage was to be reinstated according to the original terms and any right of Select or U.S. Bank to recover any amounts alleged to have arisen prior to their filing for bankruptcy were thereby extinguished.

<u>The Thompsons' Loan, and Select's Servicing Misconduct, during and post-Bankruptcy</u>

57.     Sometime in August of 2019, the Thompsons obtained an exact reproduction of the life of loan mortgage transactional history ("Life of Loan History") for the Loan from the system of record used by Select.  The Life of Loan History reflects the current mortgage balance, the date of receipt and application of all payments, the date of assessment for any late fees or charges, and the recording of any corporate advances for any legal fees or charges, including without limitation property inspection fees, legal fees, escrow fees, processing fees and any other collateral charges.

58.     A review of the Life of Loan History reveals a myriad of unexplainable and errant servicing conduct.

59.     A true and accurate copy of the Thompsons' Life of Loan History is attached hereto as "Exhibit A."

60.     During the course of the Bankruptcy Case, Select assessed fees and expenses, some of which were applied to the Thompsons' mortgage account as a debit and others that were applied and then reversed.

61.     Select did not provide notice of the charging of these fees and expenses to the Bankruptcy Court as required by FRBP § 3002.1.

62.     The Thompsons should not have been assessed any fees because they continued to make timely and adequate payments each month as obligated.

63.     Select continues to apply fees to the Thompsons' Mortgage as reflected in the Life of Loan, Select places the loan in a manufactured state of delinquency as early as July 12, 2019.

<u>Select's Attempts to Collect Amounts Not Owed – Written Correspondence</u>

64.     On or about July 12, 2019, Select forwarded a Notice of Default to the Thompsons, seeking immediate payment of $2,575.41.

65.     A true and accurate copy of the Notice of Default dated July 12, 2019 is attached hereto as "Exhibit B".

66.     On July 15, 2019, Select mailed to the Thompsons a Delinquency Notice.

67.     A true and accurate copy of the Delinquency Notice dated July 15, 2019 is attached hereto as "Exhibit C".

68.     On July 23, 2019, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,716.94

69.     A true and accurate copy of the Notice of Default dated July 23, 2019 is attached hereto as "Exhibit D".

70.     On October 17, 2019, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,746.94

71.     A true and accurate copy of the Notice of Default dated October 17, 2020 is attached hereto as "Exhibit E".

72.     On November 20, 2019, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,746.94

73.     A true and accurate copy of the Notice of Default dated November 20, 2019 is attached hereto as "Exhibit F".

74.     On December 17, 2019, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,746.94

75.     A true and accurate copy of the Notice of Default dated December 17, 2020 is attached hereto as "Exhibit G".

76.     On January 17, 2020, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,746.94

77.     A true and accurate copy of the Notice of Default dated January 17, 2020 is attached hereto as "Exhibit H".

78.     On February 24, 2020, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,7461.94

79.     A true and accurate copy of the Notice of Default dated February 24, 2020 is attached hereto as "Exhibit I".

80.     On April 21, 2020, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,776.94

81.     A true and accurate copy of the Notice of Default dated April 21, 2020 is attached hereto as "Exhibit J".

82.     On May 20, 2020, Select mailed to the Thompsons a Notice of Default, seeking immediate payment of $1,776.94

83.     A true and accurate copy of the Notice of Default dated May 20, 2020 is attached hereto as "Exhibit K".

84.     On May 21, 2020, Select mailed to the Thompsons an additional Delinquency Notice.

85.     A true and accurate copy of the Delinquency Notice dated May 21, 2020 is attached hereto as "Exhibit L".

86.     Each Notice of Default and Delinquency Notice set forth above threatened foreclosure and sought immediate payment of amounts the Thompsons  did not owe.

87.     The Notices of Default and Delinquency Notices set forth above contained false and misleading statements.

88.     Each of the notices described above occurred after Select had been notified, on numerous occasions, of its errors and despite Thompson's pleas for the letters to stop.

89.     Each Notice of Default and Delinquency Notice exacerbated the emotional distress caused to the Thompsons by Select's servicing errors and/or failure to correct said errors.

Select's Attempts to Collect Amounts Not Owed – Calls

90.     From August 2019 to  May 2020, Select or its agents caused collection calls or text messages to be made from (904) 722-7050 and (801) 594-6000 to Lavonna Thompson's cellphone, on:

- August 14, 2019;
- September 18, 2019;
- September 20, 2019;
- September 24, 2019;
- September 27, 2019;
- October 1, 2019;
- October 2, 2019;
- October 4, 2019;
- October 9, 2019;
- October 16, 2019;
- October 24, 2019;
- October 25, 2019;
- October 30, 2019;
- November 7, 2019;
- November 26, 2019;
- December 24, 2019;
- December 26, 2019;
- December 31, 2019;
- January 16, 2020;
- January 28, 2020:
- January 29, 2020;
- January 30, 2020;
- January 31, 2020;
- February 5, 2020;

- February 6, 2020:
- February 7, 2020;
- March 4, 2020;
- April 24, 2020;
- April 29, 2020;
- April 30, 2020;
- May 21, 2020.

91.     From September 2019 to May 2020, Select or its agents caused collection calls or text messages to be made from (904) 722-7050 and (801) 594-6000 to Ricky Thompson's cellphone, on:

- September 17, 2019;
- September 18, 2019;
- September 19, 2019;
- September 20, 2019;
- September 23, 2019;
- September 24, 2019;
- September 25, 2019;
- September 26, 2019;
- October 1, 2019;
- October 2, 2019;
- October 3, 2019;
- October 7, 2019;
- October 8, 2019;
- October 9, 2019;
- October 10, 2019;
- October 16, 2019;
- October 22, 2019;
- October 30, 2019;
- November 8, 2019;
- November 19, 2019;
- November 20; 2019;
- November 22; 2019;
- November 25, 2019;
- November 26, 2019;
- November 27, 2019;
- November 29, 2019;
- December 2, 2019;
- December 4, 2019;
- December 6, 2019;
- December 11, 2019;

- December 13, 2019;
- December 17, 2019;
- December 18, 2019;
- December 19, 2019;
- December 20, 2019;
- December 23, 2019;
- December 24, 2019;
- December 26, 2019;
- December 27, 2019;
- December 31, 2019;
- January 2, 2020;
- January 3, 2020;
- January 6, 2020;
- January 7, 2020;
- January 8, 2020;
- January 9, 2020;
- January 10, 2020;
- January 14, 2020;
- January 16, 2020;
- January 18, 2020;
- January 22, 2020;
- January 23, 2020;
- January 24, 2020;
- January 25, 2020;
- January 28, 2020;
- January 29, 2020;
- January 30, 2020;
- January 31, 2020;
- February 3, 2020;
- February 4, 2020;
- February 5, 2020;
- February 6, 2020;
- February 7, 2020;
- February 11, 2020;
- February 12, 2020;
- February 13, 2020;
- February 14, 2020;
- February 19, 2020;
- February 20, 2020;
- February 21, 2020;
- February 24, 2020;
- February 25, 2020;
- February 27, 2020;
- February 29, 2020;

- March 2, 2020;
- March 4, 2020;
- March 5, 2020;
- March 6, 2020;
- March 10, 2020;
- March 12, 2020;
- March 13, 2020;
- March 18, 2020;
- March 25, 2020;
- April 9, 2020;
- April 16, 2020;
- April 24, 2020;
- April 27, 2020;
- April 29, 2020;
- April 30, 2020;
- May 2, 2020;
- May 5, 2020;
- May 7, 2020;
- May 8, 2020;
- May 12, 2020;
- May 14, 2020;
- May 16, 2020;
- May 21, 2020.

92.     Select did not have Thompsons' consent to use an automatic telephone dialing system and/or a robocaller or prerecorded voice in making the calls to their cellphones.

93.     Select placed, or cause to be placed, the aforementioned calls using an artificial and/or pre-recorded voice.  When the Thompsons answered the phone, they heard a message stating the call was intended to reach them about "an important business matter" or some other purposes and inviting them to press one of the enumerated digits before connecting him to an Select representative.

94.     On numerous occasions, the Thompsons notified Select of its error in treating the Loan as if it were in default and requested that Select cease calling and texting.

95.     Each call set forth above was designed to collect upon amounts the Thompsons did not owe to Select.

96.     Each call set forth above exacerbated the emotional distress caused to Thompson by Select's servicing errors and failure to correct said errors.

### The Thompsons' Efforts to Seek Information from Select and have Errors Corrected

97.     During many of the aforementioned calls, the Thompsons notified the Select representative, or their supervisor, that any alleged delinquency was an error.

98.     Recognizing that Select had made an egregious error with respect to the servicing of their Loan, fearing foreclosure, and unable to resolve the issue by paying amounts she knew to be correct or by means of their conversations with Select's representatives, the Thompsons was forced to seek the assistance of legal counsel.

99.     By letter dated July 24, 2019, the Thompsons directed correspondence to Select captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 1" in hopes of obtaining documents necessary to ascertain the cause of the alleged default.

100.    A true and accurate copy of RFI No. 1 is attached hereto as "Exhibit M."

101.    Select received RFI No. 1 on July 29, 2019 as evidenced by USPS certified mail tracking.

102.    In response to RFI No. 1, on August 1, 2019, Select failed to provide the following requested information: (i) a summary of reporting of the Thompson's account to CRAs; (ii) Automated Consumer Dispute Verifications ("ACDVs") received from any CRAs; (iii) Dispute Response Notifications ("DRNs") received from CRAs; (iv) Automated Universal Data ("AUD") forms received from CRAs; (v) a printout or screenshot of the DLQ1 with HPMT screen for the Loan; or (vi) a printout of the "My Conversations" report for the loan.

103.    A true and accurate copy of Select's response to RFI No. 1 is attached hereto as "Exhibit N."

104.     In response to RFI No. 1, Select provided the Thompsons with a copy of the Life of Loan History described above.

105.     Select's failure to provide the documents set forth above caused the Thompsons an information injury.

106.     Specifically, if the Thompsons had been provided the documents they requested and were legally entitled to receive, they would have been better able to respond to the default claims by relaying information contained therein and/or provide Select with a more detailed description of its errors before its initiation.

107.     By letter dated July 26, 2019, the Thompsons directed correspondence to Select captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 2") requesting information regarding ownership of the Loan, a Payoff Statement, and all servicing notes related to the Loan.

108.     A true and accurate of RFI No. 2 to Select is attached hereto as "Exhibit O."

109.     Select received RFI No. 2 on August 1, 2019, as evidenced by USPS certified mail tracking.

110.     By letter dated July 29, 2019, the Thompsons directed additional correspondence to Select captioned "Request for Information Pursuant to Section 1024.36 of Regulation X" ("RFI No. 3) requesting analyses of the escrow account, a copy of the current mortgage note and any allonges or assignments, copies of collection letters and notes, foreclosure correspondence or notices sent to the Thompsons, and copies of all property inspection reports and broker price opinions concerning the loan.

111.     A true and accurate of RFI No. 3 to Select is attached hereto as "Exhibit P."

112.    On August 13, 2019, Select responded to RFI No. 2 and RFI No. 3 but again failed to provide any information pertaining to how it was reporting the Loan to the CRA's.

113.    A true and accurate copy of the Select response to RFI No. 2 and RFI No. 3 is attached hereto as "Exhibit Q."

114.    On August 12, 2019, the Thompsons directed correspondence to Select captioned "Notice of Error Pursuant to Section 1024.35 of Regulation X" ("NOE No. 1"), for: (i) failing to timely and accurate credit payments as obligated, a defined error as set forth in 12 C.F.R. § 1026.36(c)(3); (ii) failing to provide an accurate payoff statement as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6); (iii) failing to provide requested credit reporting information; and, (iv) improperly imposing fees for which it had no reasonable basis to impose.

115.    NOE No. 1 also requested Select provide all documents it relied upon if it were to determine no error had occurred, per Reg. X, 12 C.F.R. §§ 1024.35(e)(1).

116.    A true and accurate copy of NOE No. 1 is attached hereto as "Exhibit R."

117.    By and through NOE No. 1, and their other communications with Select representatives, the Thompsons brought the aforementioned errors to Select's attention, made them aware of the false default status on the Loan, and requested that the errors be investigated and corrected.

118.    Select received NOE No. 1 on August 19, 2019, as evidenced by USPS certified mail tracking.

119.    On September 13, 2019, Select responded to NOE No. 1 concluding no error had occurred. Specifically, Select's response states: (i) "Please be advised that the loan transferred to SPS in May 2016, due for March 2016. SPS has received a payment every month for the correct amount, meaning that the account did not become more current, nor fall more past due."; (ii)

"…there was a missed payment in April 2014…the account was one payment past due ever since that date, as only one payment has been received each month thereafter with the prior servicer."; and, (iii) "The remaining documentation requests are overbroad and unduly burdensome, and will not be fulfilled."

120.    A true and accurate copy of Select's response to NOE No. 1 is attached hereto as "Exhibit S."

121.    If Select had performed a reasonable investigation into the errors alleged by the Thompsons' it would have determined the Loan was current or, based on its own language above, one payment behind.

122.    In addition, Select's response to NOE No. 1 that no errors were found is contradicted by its decision to remove "certain charges" and failure to explain why it believed one payment had been missed yet simultaneously contending the Loan was in default. *See Wilson v. Bank of Am.*, 48 F. Supp. 3d 787 (E.D. Pa. 2014)(Plaintiff sufficiently alleged that servicer did not conduct a reasonable investigation of their notices of error where the servicer sent their response with contradictory explanations for why the actions she requested were not taken).

123.    Any reasonable investigation into the errors alleged by NOE No. 1, even without the benefit of additional communications from the Thompsons, would have uncovered the errors alleged and resulted in some action being taken to address them.

124.    By information and belief, Select did not contact Household Finance Corporation about the April 2014 payment it now alleges was missed.

125.    Select did not contact the Thompsons about the April 2014 payment.

20

126.     In addition, Select did not provide the requested documents or information it relied on in reaching its apparent determination that no error occurred within fifteen business as required by Reg. X, 12 C.F.R. § 1024.36(e)(4).

127.     On July 17, 2020, the Thompsons directed correspondence to Select captioned "Second Notice of Errors under 12 C.F.R. §1024.35(b)(11)" ("NOE No. 2") identifying errors including without limitation: (i) continuing to hold the Loan in a manufactured state of delinquency or default; (ii) failing to appropriately apply payments; (iii) failing to adequately investigate the errors identified in NOE No. 1; and, (iv) failing to provide copies of requested credit reporting information that did not constitute an overly broad or unduly burdensome request.

128.     A true and accurate copy of NOE No. 2 is attached hereto as "Exhibit T."

129.     NOE No. 2 also disputed any information or reporting previously made by Select to any credit bureau suggesting she was delinquent or had an unpaid balance.

130.     NOE No. 2 also requested that Select take specific actions to correct the errors identified therein.

131.     To date, Select has taken no action to correct the distinct errors identified in NOE No. 2 or remove the false default status on the Loan.

**Inaccurate and Materially Misleading Information Reported by Equifax – LaVonna**

132.     Sometime in or around April of 2019, LaVonna obtained a copy of her consumer credit report as published by Equifax.

133.     The report contained incomplete, misleading, and inaccurate information relative to her Select tradeline, now being published and reported by Equifax. Specifically, the Equifax credit report reflected that the date of LaVonna's last payment to Select towards her mortgage

obligation was in August of 2013, that the account was "included in [a] wage earner plan," that the obligation was "Bankruptcy Chapter 13; Real Estate Mortgage; Bankruptcy Completed" - a reference used by Equifax to delineate accounts included and discharged in bankruptcy, and failed to include any reference to the timely adequate payments she has and continues to make.

134.    Equifax's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, as discussed above.

135.    While not dispositive, Courts rely on such guidance to determine furnisher liability. *See e.g. Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

136.    Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

137.    Therefore, within a letter dated May 31, 2019, LaVonna disputed the inaccurate and misleading information to Equifax and advised Equifax of the specific facts that rendered the reporting inaccurate and misleading.

138.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit U."

139.    Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Select of LaVonna's dispute within five business days of receipt, to forward all relevant information and any documents included therewith, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline.

140.    In response, within a document dated June 13, 2019, Equifax advised LaVonna that it had researched her dispute and the current status was being reported correctly.  However,

Equifax provided a copy of the disputed Select tradeline that merely reproduced the errors identified by Thompson in her original dispute letter.

141.    A true and accurate copy of Equifax's reinvestigation report is attached hereto as "Exhibit V."

142.    Thereafter, LaVonna obtained an "updated" copy of her Equifax credit report as published by Equifax on or about June 18, 2019. That report contained inaccurate, incomplete, and misleading information relative to her Select tradeline. Specifically, it failed to reflect a current balance and payment history despite the fact that LaVonna has and continues to make timely and adequate payments on the account.

143.    Therefore, within a letter dated March 4, 2020, LaVonna again disputed the inaccurate and misleading information to Equifax and advised Equifax of the specific facts that rendered the reporting inaccurate and misleading.

144.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit W."

145.    To date, LaVonna has not received a response from Equifax in regard to her dispute letter dated March 4, 2020, dispute letter.

146.    Upon information and belief, Equifax notified Select of LaVonna's dispute in accordance with 15 U.S.C.A. § 1681i (West).

147.    In the alternative, Equifax failed to notify Select of LaVonna's dispute in violation of 15 U.S.C.A. § 1681i (West).

148.    LaVonna provided all necessary information with her dispute letter to Equifax, does have a current Equifax file, and has actively used credit in the past ten years.

149.    Equifax was required to communicate the specifics of LaVonna's dispute to

Select.  Likewise, Select had a duty to investigate the dispute and accurately report their findings to Equifax.

150.    Equifax had an affirmative duty to reasonably reinvestigate the dispute submitted by LaVonna and to accurately report the tradeline information notwithstanding the information it received from Select.

**Inaccurate and Materially Misleading Information Reported by Equifax - Ricky**

151.    Sometime in April of 2019, Ricky obtained a copy of his consumer credit report as published by Equifax.

152.    The report contained incomplete, misleading, and inaccurate information relative to his Select tradeline, now being published and reported by Equifax. Specifically, the Equifax credit report reflected that the date of Ricky's last payment to Select towards hismortgage obligation was in August of 2013, that the account was "included in [a] wage earner plan," that the obligation was "Bankruptcy Chapter 13; Real Estate Mortgage; Bankruptcy Completed" - a reference used by Equifax to delineate accounts included and discharged in bankruptcy, and failed to include any reference to the timely adequate payments he has and continues to make.

153.    Equifax's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, as discussed above.

154.    While not dispositive, Courts rely on such guidance to determine furnisher liability. *See e.g. Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

155.    Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No.

05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

156.    Therefore, within a letter dated May 31, 2019, Ricky disputed the inaccurate and misleading information to Equifax and advised Equifax of the specific facts that rendered the reporting inaccurate and misleading.

157.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit X."

158.    Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify Select of Ricky's dispute within five business days of receipt, to forward all relevant information and any documents included therewith for Select to review, to conduct a reasonable reinvestigation of the disputed information, and to thereafter correct the tradeline or delete it from Thompson's consumer file.

159.    In response, within a document dated July 3, 2019, Equifax advised Ricky that it had researched his dispute and the current status was being reported correctly.  However, Equifax provided a copy of the disputed Select tradeline that merely reproduced the errors identified by Thompson in his original dispute letter including but not limited to the omission or suppression of any information that would suggest the account was open and in good standing. In fact, instead of correcting the date of last payment, Equifax or Select merely changed it to "07/2016" , which is also inaccurate.

160.    A true and accurate copy of Equifax's reinvestigation report is attached hereto as "Exhibit Y."

161.    Thereafter, Ricky obtained a copy of his Equifax credit report as published by Equifax on or about July 3, 2019. That report contained inaccurate, incomplete, and misleading information relative to her Select tradeline. Specifically, it failed to reflect a current balance and

payment history despite the fact that Ricky has and continues to make timely and adequate payments on the account.

162.    Therefore, within a letter dated March 4, 2020, Ricky disputed the inaccurate and misleading information to Equifax and advised Equifax of the specific facts that rendered the reporting inaccurate and misleading.

163.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit Z."

164.    To date, Ricky has not received a response from, nor had any reinvestigation been performed by, Equifax in response to the dispute letter dated March 4, 2020.

165.    Equifax notified Select of Ricky's dispute in violation of 15 U.S.C.A. §1681i (West).

166.    In the alternative, Equifax failed to notify Select of Ricky's dispute in violation of 15 U.S.C.A. § 1681i (West).

167.    Ricky provided all necessary information with his dispute letter to Equifax, does have a current Equifax file, and has actively used credit in the past ten years.

168.    Equifax was required to communicate the specifics of Ricky's dispute to Select.  Likewise, Select had a duty to investigate the dispute and accurately report their findings to Equifax.

169.    Equifax had an affirmative duty to reasonably reinvestigate the dispute submitted by Ricky and to accurately report the tradeline information notwithstanding the information it received from Select.

**Inaccurate and/or Materially Misleading Information Reported by Trans Union - LaVonna**

170.    Also in or around April of 2019, LaVonna obtained a copy of her credit report as published by Trans Union.

171.     That report contained inaccurate and misleading information as provided by Select. Specifically, the Trans Union credit report reflected that LaVonna's obligation to Select was an "adverse account," "Closed" on July 11, 2016, and that the date of last payment towards the mortgage was on "7/8/2016" despite the fact the account remains open and payments continue to be made to this very day.

172.     Trans Union's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, which provides guidance for credit reporting and FCRA compliance.

173.     While not dispositive, Courts rely on such guidance to determine furnisher liability. *See Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

174.     Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

175.     Thus, within a letter dated May 31, 2019, LaVonna disputed the inaccurate and misleading information to Trans Union and advised Trans Union of the specific facts that rendered the reporting inaccurate and misleading.

176.     A true and accurate copy of the dispute letter is attached hereto as "Exhibit AA."

177.     Pursuant to 15 U.S.C. § 1681i, Trans Union had a duty to notify Select of LaVonna's dispute within five business days, to forward all relevant information or documents included therewith for Select to review, to conduct a reasonable reinvestigation of the dispute information, and to thereafter correct the tradeline.

178.    In response, within a document dated just thirteen days later on June 13, 2019, Trans Union advised LaVonna it had researched her dispute and the current status was being reported correctly.  However, Trans Union provided a copy of the disputed tradelines that reproduced some of the errors identified by Thompson in her original dispute letter but also made changes that were themselves inaccurate.

179.    For example, Trans Union failed to address the inaccurate "Date Closed" and "Date of Last Payment" reported on the Select tradeline, yet included a "Pay Status" of ">Account Included in Bankruptcy<" a phrase used by Trans Union to identify accounts included and discharged in bankruptcy.

180.    Because "included in bankruptcy" is open to an interpretation that is contradictory to the true information and misleading, the notation cannot be said to be accurate as a matter of law. *Hollins v. Trans Union, LLC*., Cause No. H-18-2951, 2019 WL 2296281 (SD Tex. May 3, 2019).

181.    A true and accurate copy of the relevant portion of the Trans Union reinvestigation report is attached hereto as "Exhibit BB."

182.    Thereafter, LaVonna again disputed inaccurate, incomplete, and misleading information relative to her Select tradeline. Specifically, it failed to reflect a balance and scheduled payment amount, indicated the account was closed with an errant date of last payment, and failed to reflect an accurate payment history despite the fact that LaVonna has and continues to make timely and adequate payments.

183.    Therefore, within a letter dated March 4, 2020, LaVonna disputed the inaccurate and misleading information to Trans Union and advised Trans Union of the specific facts that rendered the reporting inaccurate and misleading.

184.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit CC."

185.    To date, LaVonna has not received a response or any reinvestigation from Trans Union in regard to her March 4, 2020, dispute letter.

186.    Upon information and belief, Trans Union timely notified Select of LaVonna's dispute in accordance with 15 U.S.C.A. § 1681i.

187.    In the alternative, Trans Union did not notify Select of LaVonna's dispute and did not perform any reinvestigation into the dispute under either "standard" or "expedited" procedures as described by § 1681i(a)(8).

188.    LaVonna's dispute was not frivolous or irrelevant.

189.    Trans Union did not inform LaVonna that it had determined the dispute to be frivolous or irrelevant.

190.    Trans Union did not identify any additional information required to investigate LaVonna's dispute.

**Inaccurate and/or Materially Misleading Information Reported by Trans Union - Ricky**

191.    Also in or around April of 2019, Ricky obtained a copy of his credit report as published by Trans Union.

192.    That report contained inaccurate and misleading information as provided by Select. Specifically, the Trans Union credit report reflected that Thompson's mortgage obligation to Select was an "adverse account," that the account was "Closed" on July 11, 2016, and with a date of last payment of  "7/8/2016" despite the account being open and in good standing.

193.    Trans Union's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, which provides guidance for credit reporting and FCRA compliance.

194.    While not dispositive, Courts rely on such guidance to determine furnisher liability. *See Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

195.    Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

196.    Thus, within a letter dated May 31, 2019, Ricky disputed the inaccurate and misleading information to Trans Union and advised Trans Union of the specific facts that rendered the reporting inaccurate and misleading.

197.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit DD."

198.    Pursuant to 15 U.S.C. § 1681i, Trans Union had a duty to notify Select of Ricky's dispute within five business days, to forward all relevant information or documents included therewith to Select for review, to conduct a reasonable reinvestigation of the dispute information, and to thereafter correct the tradeline.

199.    In response, within a document dated just thirteen days later on June 13, 2019, Trans Union advised Ricky that it had researched his dispute and the current status was being reported correctly.  However, Trans Union provided a copy of the disputed tradelines that reproduced some of the errors identified by Ricky in his original dispute letter but also made changes that were themselves inaccurate.

200.    For example, Trans Union failed to address the inaccurate "Date Closed" and "Date of Last Payment" reported on the Select tradeline, yet included a "Pay Status" of ">Account Included in Bankruptcy<" a phrase used by Trans Union to identify accounts

included and discharged in bankruptcy.

201.    Because "included in bankruptcy" is open to an interpretation that is contradictory to the true information and misleading, the notation cannot be said to be accurate as a matter of law. *Hollins v. Trans Union, LLC*., Cause No. H-18-2951, 2019 WL 2296281 (SD Tex. May 3, 2019).

202.    A true and accurate copy of the relevant portion of the Trans Union reinvestigation report is attached hereto as "Exhibit EE."

203.    Thereafter, Ricky again disputed inaccurate, incomplete, and misleading information relative to his Select tradeline. Specifically, it failed to reflect a balance and scheduled payment amount, indicated the account was closed with an errant date of last payment, and failed to reflect an accurate payment history despite the fact that Ricky has and continues to make timely and adequate payments.

204.    Therefore, within a letter dated March 4, 2020, Ricky disputed the inaccurate and misleading information to Trans Union and advised Trans Union of the specific facts that rendered the same inaccurate.

205.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit FF."

206.    In response, within a document dated March 19, 2020, Trans Union responded to Ricky's dispute and deleted the Select tradeline from his credit report.

207.    A true and accurate copy of the relevant portion of the Trans Union reinvestigation report is attached hereto as "Exhibit GG."

208.    Upon information and belief, Trans Union did not notify Select of Ricky's dispute and did not perform any reinvestigation into the dispute under either "standard" or "expedited" procedures as described by § 1681i(a)(8).

209.    Ricky's dispute was not frivolous or irrelevant.

210.    Trans Union did not inform Ricky that it had determined the dispute to be frivolous or irrelevant.

211.    Trans Union did not identify any additional information required to investigate Ricky's dispute.

212.    Trans Union had an affirmative duty to reasonably reinvestigate the dispute submitted by Ricky and to accurately report the tradeline information notwithstanding the information it received from Select.

**Inaccurate and/or Materially Misleading Information Reported by Experian - LaVonna**

213.    Also in or around April of 2019, LaVonna obtained a copy of her credit report as published by Experian.

214.    That report contained inaccurate and misleading information relative to her mortgage obligation with Select. Specifically, the Experian credit report reflected that Thompson's obligation to Select was an account that may be considered negative and that was "Discharged through Bankruptcy Chapter 13" and "included in Chapter 13 bankruptcy on Aug 23, 2013."

215.    The reporting above was inaccurate and misleading because the Thompsons continue to make timely and adequate payments on her obligation to Select and it was not discharged via her Chapter 13 bankruptcy.

216.    In addition, the report contained incomplete and misleading information in that it provided no indication whatsoever that the obligation was open and active or to reflect the Thompson's ongoing payments.

217.    Alternatively, the report contained inaccurate and misleading information in that

it reflects information not actually provided by Select.

218.    Alternatively, the report contained inaccurate and misleading information in that the Select obligation is being reported in way that Experian does not typically report mortgage obligations that survive a Chapter 13 bankruptcy proceeding.

219.    Experian's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, which provides guidance for credit reporting and FCRA compliance.

220.    While not dispositive, Courts rely on such guidance to determine furnisher liability. *See Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

221.    Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

222.    Thus, within a letter dated May 31, 2019, LaVonna disputed the inaccurate and misleading information to Experian and advised Experian of the specific facts that rendered the reporting inaccurate and misleading.

223.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit HH."

224.    Pursuant to 15 U.S.C. § 1681i, Experian had a duty to notify Select of LaVonna's dispute within five business days, to forward all relevant information or documents included therewith for Select to review, to conduct a reasonable reinvestigation of the dispute information, and to thereafter correct the tradeline.

225.    In response, within a document dated June 19, 2019, Experian advised

LaVonna that it had researched her dispute and verified that the information was accurate and updated certain information.  However, Experian provided a copy of the disputed tradelines that: a) errantly states that the account status was "Petition for Chapter 13 Bankruptcy/Never late" before Experian received the aforementioned  dispute; and b) updated the status of the account to "Petition for Chapter 13 Bankruptcy" yet failed to provide any information whatsoever about the actual status of the obligation or the fact the Thompsons continue to make and Select continues to service and accept payments towards it; and, c) continues to omit or suppress important information being provided by Select to Experian.

226.    As Experian knows, the mortgage tradeline should reflect an active balance and indication of payment history.

227.    Further, because "Petition for Chapter 13 Bankruptcy" is open to an interpretation that is contradictory to the true information and misleading, the notation cannot be said to be accurate as a matter of law. *Hollins v. Trans Union, LLC*., Cause No. H-18-2951, 2019 WL 2296281 (SD Tex. May 3, 2019).

228.    A true and accurate copy of the relevant portion of the Experian reinvestigation report is attached hereto as "Exhibit II."

229.    Thereafter, LaVonna obtained a copy of her Experian credit report as published by Experian on or about June 18, 2019. That report contained inaccurate, incomplete, and misleading information relative to her Select tradeline. Specifically, it failed to report her payments to Select and stated that she filed for Chapter 13 Bankruptcy on July 11, 2016, although she did not.

230.    Therefore, within a letter dated March 4, 2020.

LaVonna disputed the inaccurate and misleading information to Experian and advised Experian of the specific facts that rendered the reporting inaccurate and misleading.

231.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit JJ."

232.    Within a document dated April 2, 2020, Experian responded to LaVonna's dispute and updated the account--however, those updates were partially inaccurate in that they indicated LaVonna was $858 past due as of April 2020 despite the fact that she was up to date on payments at that time and had not missed a payment in the past year as indicated on the dispute letter.

233.    Upon information and belief, Experian timely notified Select of LaVonna's dispute in accordance with 15 U.S.C.A. § 1681i.

234.    In the alternative, Experian did not notify Select of LaVonna's dispute and did not perform any reinvestigation into the dispute under either "standard" or "expedited" procedures as described by § 1681i(a)(8).

235.    LaVonna's dispute was not frivolous or irrelevant.

236.    Experian did not inform LaVonna it concluded her dispute was frivolous or irrelevant.

237.    Experian did not identify any additional information required to investigate LaVonna's dispute.

**Inaccurate and/or Materially Misleading Information Reported by Experian - Ricky**

238.    Also in or around May of 2019, Ricky obtained a copy of his credit report as published by Experian.

239.    That report contained inaccurate and misleading information relative to his

35

mortgage obligation with Select. Specifically, the Experian credit report reflected that Ricky's obligation to Select was an account that could be considered negative and that was "Discharged through Bankruptcy Chapter 13".

240.    The reporting above was inaccurate and misleading because the Thompsons continue to make timely and adequate payments on his obligation to Select and the Loan was not discharged via their Chapter 13 bankruptcy.

241.    In addition, the report contained incomplete and misleading information in that it provided no indication whatsoever that the obligation was open and active or to reflect the Thompson's ongoing payments.

242.    Alternatively, the information is inaccurate and misleading because the reporting is not based on any information actually provided by Select.

243.    Experian's reporting was also inaccurate and misleading because it does not comply with the CDIA's Metro 2 reporting standards, which provides guidance for credit reporting and FCRA compliance.

244.    While not dispositive, Courts rely on such guidance to determine furnisher liability. *See Nissou-Rabban v. Capital One Bank (USA), N.A.*, 285 F. Supp. 3d 1136 (S.D. Cal., Jan. 23, 2018).

245.    Further, failure to adhere to the Metro 2 format, and/or the failure to follow the guidance of regulatory and industry sources, such as the CDIA, is evidence of willfulness of an FCRA violation under 15 U.S.C. § 1681n (a). *See Gillespie v. Equifax Info. Servs., LLC.*, No. 05C138, 2008 WL 4316950 (N.D. Ill. Sept. 15, 2008).

246.    Thus, within a letter dated May 31, 2019, Ricky disputed the inaccurate and

misleading information to Experian and advised Experian of the specific facts that rendered the reporting inaccurate and misleading.

247.     A true and accurate copy of the dispute letter is attached hereto as "Exhibit KK."

248.     Pursuant to 15 U.S.C. § 1681i, Experian had a duty to notify Select of Ricky's dispute within five business days, to forward all relevant information or documents included therewith to Select for review, to conduct a reasonable reinvestigation of the dispute information, and to thereafter correct the tradeline.

249.     In response, within a document dated June 17, 2019, Experian advised Ricky that it had researched his dispute and the current status was being reported correctly.  However, Experian provided a copy of the disputed tradelines that: a) errantly states that the account status was "Petition for Chapter 13 Bankruptcy/Never late" before Experian received the aforementioned  dispute; b) continued to report the status of the account as "Discharged through Bankruptcy Chapter 13" – different than the way Experian is reporting the same tradeline on LaVonna's credit report; c) continues to not provide any information whatsoever about the actual status of the mortgage obligation or the fact that the Thompsons continues to make and Select continues to service and accept payments towards it; and, c) continues to omit or suppress important information being provided by Select to Experian.

250.     As Experian knows, the mortgage tradeline should reflect an active balance and payment history.

251.     A true and accurate copy of the relevant portion of the Experian reinvestigation report is attached hereto as "Exhibit LL."

252.     Thereafter, Ricky obtained a copy of his Experian credit report as published by

Experian on or about June 17, 2019. That report contained inaccurate, incomplete, and misleading information relative to his Select tradeline. Specifically, it failed to report his payments to Select and stated that the account was included in bankruptcy on or about August 23, 2013.

253.    Therefore, within a letter dated March 4, 2020, Ricky disputed the inaccurate and misleading information to Experian and advised Experian of the specific facts that rendered the reporting inaccurate and misleading.

254.    A true and accurate copy of the dispute letter is attached hereto as "Exhibit MM."

255.    In response, within a document dated April 2, 2020, Experian responded to Ricky's  dispute and updated the account--however, those updates were inaccurate in that they indicated Ricky was $858 past due as of April 2020 despite the fact he was and had been current.

256.    A true and accurate copy of the Experian reinvestigation report letter is attached hereto as "Exhibit NN."

257.    Upon information and belief, Experian timely notified Select of Ricky's dispute in accordance with 15 U.S.C.A. § 1681i.

258.    In the alternative, Experian did not notify Select of Ricky's dispute and did not perform any reinvestigation into the dispute under either "standard" or "expedited" procedures as described by § 1681i(a)(8).

259.    Ricky's dispute was not frivolous or irrelevant.

260.    Experian did not inform Ricky it determined the dispute to be frivolous or irrelevant.

261.    Experian did not identify any additional information required to investigate Ricky's dispute.

38

262.     Experian had an affirmative duty to reasonably reinvestigate the dispute submitted by Ricky and to accurately report the tradeline information notwithstanding the information it received from Select.

### The CRA's Willful Conduct in Detail.

263.     Under § 1681i, which mandates the procedures a CRA must follow in cases of disputed accuracy, there are (only) two scenarios under which a CRA *may* legally be allowed to refrain from notifying the furnisher of disputed information of a consumer's dispute: 1.) if a CRA determines that a consumer's dispute is frivolous or irrelevant; and/or, 2.) if the CRA resolves the dispute under an expedited dispute resolution process.

264.     Neither scenario applies to the CRA's conduct as complained of herein.

265.     Under § 1681i (a) (3), a CRA *may* be relieved of its duty to notify the furnisher of the disputed information of the consumer's dispute if the CRA determines that a consumer's dispute is frivolous or irrelevant.

266.     However, because § 1681i(a)(2) requires that a CRA notify a furnisher of disputed information within five days of receiving a consumer's dispute, the CRA must make the determination that the dispute is frivolous or irrelevant before the five (5) days is up.

267.     In the event, a CRA determines that a consumer's dispute is frivolous or irrelevant, § 1681i (a) (3) requires the CRA to notify the consumer notice of the CRA's determination. That notice must: be given within five days of the CRA's determination; be in writing, or by other means authorized by consumer; state the reason(s) the CRA determined the dispute was frivolous or irrelevant; and, identify any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

268.     The CRA's did not inform the Thompsons that it had determined their disputes were frivolous or irrelevant, as required by § 1681i (a) (3) (B) if a dispute is determined to be frivolous or irrelevant.

269.     If the CRA's had conducted a reasonable reinvestigation and notified Select of the Thompsons' disputes, the mortgage tradeline would be reporting accurately and differently than they are now.

270.     The CRA's had the ability to easily conduct a reasonable reinvestigation of Thompsons' disputes.

271.     Despite the foregoing, the CRA's made the intentional choice to not conduct a reasonable reinvestigation of the Thompsons' disputes, in reckless disregard of its duties under the FCRA.

272.     Accordingly, the CRA's conduct was willful.

<u>Impact on, and Damage to, the Thompsons</u>

273.     Due to the actions of Select, the Thompson's Loan remains in a wrongful and false "default" status.

274.     By wrongfully placing the Loan in default and flooding the Thompsons with collection attempts, Select caused the Thompsons to suffer great emotional distress including fear of losing their Home.

275.     The aforementioned emotional distress was magnified by the events set forth herein occurring after what they believed was to be a fresh following the successful completion of their of their bankruptcy proceedings.

276.     Because of the wrongful and false "default" status on the Loan, Select has imposed a number of unwarranted fees on the Loan including improper late fees and improper

default service fees, such as fees for property inspection, and corporate advances, that they have

failed to remove.

277.    In addition, the actions of Select, in wrongfully and falsely claiming that the

Loan is in default has caused the Thompsons to suffer harm to their credit.

278.    Select has reported the Loan as delinquent to Trans Union, Experian and Equifax.

279.    This reporting was disputed by the Thompsons on several occasions, but no

correction is known to have been made by Select in response.

280.    This false and misleading reporting has resulted in the unlawful suppression of the

Thompsons' credit rating, the denial of credit, and a diminishment of the credit available to them.

<u>Select's Pattern & Practice of Illegal Conduct</u>

281.    Select has engaged in a pattern and practice of mistreating mortgage loan

borrowers and violating provisions of RESPA and the regulations promulgated thereunder at

Regulation X.

282.    That pattern and practice entails dozens of servicing errors and a continued refusal

to correct the same here and with respect to other similarly situated consumers.

283.    In addition, at the time of the filing of this Complaint, Select has had at least

8,000 consumer complaints lodged against it nationally concerning its mortgage servicing and

related conduct.  Each such complaint is filed and cataloged in the CFPB's publicly accessible

online database, which can be located at the following hyperlink:

http://www.consumerfinance.gov/complaintdatabase/.

284.    On August 31, 2018, Select was sued by Glenn Williams and others in the United

States District Court for the Northern District of Illinois (Case No. 1:18-cv-06015) for acts and

omissions strikingly similar to these alleged herein including without limitation seeking to

collect upon amounts not owed, reporting inaccurate information to the national credit reporting agencies, failing to reasonably investigate  and respond to borrower disputes about inaccurate credit reporting, and utilizing improper collection efforts.

285.    On June 27, 2019, Select was sued by Bret Evans and Juan Beher in the United States District Court for the Eastern District of New York (Case No. 2:18-cv-05985) for acts and omissions strikingly similar to those alleged herein including without limitation the miscalculation of interest, the failure to timely and adequately respond to borrowers' requests for information and notices of error, and the the assessment of illegal fees.

### COUNT I: Breach of Contract
### [Against U.S. Bank]

286.    The Thompsons incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

287.    The Loan is an enforceable contract between the Thompsons and U.S. Bank.

288.    A true and accurate copy of the Note and Mortgage are attached hereto as "Exhibit OO."

289.    At all times herein, Select acted at the direction of, and as the agent of, U.S. Bank.

290.    U.S. Bank is in material breach of contract for its: (i) failure to accept the Thompsons' timely and adequate mortgage payments as contractually obligated; (ii) failure to credit and apply the Thompsons' payments as contractually obligated; (iii) assessment of improper and unauthorized fees and costs; and, (iv) placing the loan in default and inaccurately reporting to credit bureaus said status.

291.    The Thompsons have fully performed their obligations pursuant to the Loan by tendering payments due and by otherwise meeting each and every obligation imposed by the Loan or the rights inherent thereto.

292.    U.S. Bank, by and through its agent Select, failed to exercise due care in the servicing of the Loan. U.S. Bank, by and through its agent Select, breached these duties to the Thompsons in an oppressive and abusive manner by declining to apply the Thompsons' tender of payments unfairly, in bad faith and without reason and by otherwise misapplying those payments.

293.    U.S. Bank's actions have caused the Thompsons concrete injury as set forth above.

**COUNT II: Violations of the RESPA**
**(Against Select)**

294.    The Thompsons incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

295.    By its acts and omissions, Select has numerous times and in numerous different ways violated the RESPA with respect to the Loan, including, but in no way limited to, those of which it was notified, each time it did any of the following: (i) failing to accept payments as contractually obligated; (ii) failing to provide an accurate payoff statement as required by 1026.36(c) of Reg. Z and 12 C.F.R. 1024.35(b)(6); (iii) imposing fees for which it had no reasonable basis to impose; (vii) failing to adequately respond to the Thompsons' RFIs and NOEs.

296.    12 C.F.R. § 1024.35(a) provides that a "servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred."

297.    Comment 1 of the CFPB's Official Interpretations of 12 C.F.R. §1024.35(a) provides that "[a] notice of error is submitted by a borrower if the notice of error is submitted by an agent of the borrower."

298.    12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to a notice of error by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance."

299.    Select has failed to correct numerous identified errors or even conduct a reasonable investigation into the same.

300.    NOE No. 1 and NOE No. 2 each meet the requirements of a notice of error as defined by 12 C.F.R. § 1024.35(a).

301.    The Thompsons have alleged by and through NOE No. 1 and NOE No. 2 that Select committed in excess of ten distinct errors pursuant to 12 C.F.R. §1024.35(b)(2) by failing to reasonably investigate identified errors, provide documentation requested, and failure to correct the multiple servicing errors raised therein.

### COUNT III: Violation of the FDCPA, 15 U.S.C. §1692k
### (Against Select)

302.     The Thompsons incorporate by reference and restates as though fully set forth herein all previous allegations of the Complaint.

303.     Select took the actions described above in an attempt to collect a debt represented by the Loan.

304.     Select violated 15 U.S.C. §1692(e)(2) when they repeatedly and continuously misrepresented the character, amount, or legal status of the Loan.  Specifically, Select has misrepresented to the Thompsons they were or are in default.

305.     Select violated 15 U.S.C. §1692(e)(5), by threatening to take an action - commence foreclosure - that cannot legally be taken as the Thompsons have fully satisfied any and all obligations under the terms of the Loan.

306.     Select violated 15 U.S.C. §1692(e)(10) when they used false representations, through false Loan statements that the Loan was past-due and in default and thus deceptive means to attempt to collect the Loan.

307.     Select violated 15 U.S.C. §1692f(1) by attempting to collect and collecting amounts (including fees, charges, or expenses incidental to the principal obligation) that were not expressly authorized by the Loan or permitted by law in the Bankruptcy Case or Chapter 13 Discharge by:  (i) misrepresenting the status of the debt; (ii) attempting to collect fees not approved by the Bankruptcy Court; (iii) declaring the loan by in delinquent or in default; (iv) threatening foreclosure; (v) reporting false information by reporting the loan delinquent to the credit bureaus.

308.     Select violated 15 U.S.C. §1692(d) by employing an unfair and unconscionable means to collect the subject debt.

309.     The Thompsons have been harmed by, and continue to suffer from harm resulting from the unfair and deceptive practices of Select in wrongfully breaching the Loan and in making misrepresentations to further effectuate their wrongdoing.

**COUNT IV: Violation of the Truth In Lending Act, 15 U.S.C. § 1601, et seq.**
**(Against U.S. Bank)**

310.     The Thompsons incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

311.     The Thompsons assert a private right of action under 15 U.S.C. § 1640(a) for:  (i) Select's breach of its duty to promptly credit payments as mandated by 15 U.S.C. § 1639f and Reg. Z, 12 C.F.R. § 1026.36(c)(1); and, (ii) Select's breach of its duty to provide a timely payoff statement pursuant to 15 U.S.C. § 1639g and Reg. Z, 12 C.F.R. §1026.36(c)(3).

<u>Failure to Promptly Credit Payments</u>

312.     15 U.S.C. § 1639f (a) provides that, "[i]n connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer."

313.     Select has failed to timely or accurately credit payments to the Loan and as a result has placed it in a manufactured state of delinquency and default.

314.     12 C.F.R. §1026.36(c)(1)(ii) provides that if a servicer retains a partial payment in a suspense or unapplied funds account (rather than credits or returns it), then the servicer must (1) disclose on the periodic statement the total amount retained in such suspense or unapplied funds account and (2) when sufficient funds accumulate to cover a full payment, promptly credit the retained funds to the oldest outstanding payment

315.    Select has failed to promptly credit funds including without limitation the Thompsons' payment in April of 2014.

316.    The Thompsons were current at the time they filed the Bankruptcy Case, made timely and adequate monthly payments throughout the duration of the Bankruptcy Case, Select made no mention of any alleged delinquency or arrearage during the Bankruptcy Case, yet Select now contends the Loan is delinquent immediately following the conclusion of the Bankruptcy Case. *See In re Cawood*, 577 B.R. 538 (Bankr. E.D. Tenn., Sept. 29, 2017).

**COUNTS V & VI:    Violation of the Fair Credit Report Act [**15 U.S.C.A. § 1681s-2(b)**]**
**(Against Select)**

317.    The Thompsons incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

318.    Select willfully and/or negligently violated 15 U.S.C.A. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of the Thompsons' disputes from one or more consumer reporting agencies, and/or by failing to review all relevant information provided by the consumer reporting agencies, and/or by failing to appropriately report the results of its investigations, and/or by failing to appropriately modify, and/or delete the inaccurate information.

319.    As a result of Select's violations of 15 U.S.C.A. § 1681s-2(b), the Thompsons have suffered actual damage including but not limited to emotional distress (including aggravation, anxiety, and loss of rest), the unjust suppression of their FICO credit scores, the payment of increased costs of credit and insurance, loss of time, loss of credit opportunities, informational injury, certain out of pocket expenses, and a guaranteed of further future financial harm if the information is not corrected.

320.     Select's actions and omissions were willful, and caused the Thompsons concrete injury as set forth above, rendering it liable for punitive damages and statutory damages pursuant to 15 U.S.C.A. § 1681n. Specifically, Select had adequate information and notice to correct the errors identified here, and with respect to other similarly situated consumers, but due to a lack of meaningful policies and procedures, or the enforcement of those policies and procedures, coupled with actions taken to minimize its costs in investigating and correcting its errors, wholly failed to take action required by law.

### COUNTS VII, VIII, IX, X: VIOLATION OF THE FCRA (EQUIFAX)
**[15 U.S.C.A. § 1681e (b) and 1681i (West)]**

321.     The Thompsons incorporate by reference all preceding paragraphs of the Complaint as though fully stated herein.

322.     Equifax negligently, or in the alternative willfully, violated 15 U.S.C.A. §1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of the Thompsons' consumer reports.

323.     Equifax also negligently and willfully violated 15 U.S.C.A. § 1681i in multiple ways including but not limited to failing to conduct a reasonable reinvestigation of the Thompsons' disputes and failing to appropriately modify inaccurate information in the Thompsons' file. *See Zahran v. Bank of Am.*, 2015 WL 4397779 (N.D. Ill. July 17, 2015)

324.     As a result of Equifax's violation of 15 U.S.C.A. § 1681e (b) and 15 U.S.C.A. §1681i,  the Thompsons have suffered actual damage including but not limited to emotional distress, the unjust suppression of their FICO credit scores, the resulting payment of increased costs of credit and insurance, loss of time, loss of credit opportunities, an informational injury, certain out of pocket expenses, and a material risk of future financial harm.

325.     Equifax's acts and omissions are the direct and proximate cause of the

Thompsons' actual damage.

### COUNTS XI, XII, XIII, XIV: VIOLATIONS OF THE FCRA (TRANS UNION)
[15 U.S.C.A. § 1681e (b) and 1681i (West)]

326.    The Thompsons incorporate by reference all preceding paragraphs of the

Complaint as though fully stated herein.

327.    Trans Union willfully, or in the alternative, negligently violated

15 U.S.C.A. §1681e(b) by failing to follow reasonable procedures to assure the maximum

possible accuracy of the Thompsons' consumer reports.

328.    Trans Union also willfully, and/or with malice, or in the alternative, negligently

violated 15 U.S.C.A. § 1681i in multiple ways including without limitation by failing to conduct

a reasonable reinvestigation of the Thompsons' disputes and by failing to appropriately modify

inaccurate information in the Thompsons' file. *See Zahran v. Bank of Am.*, 2015 WL 4397779

(N.D. Ill. July 17, 2015)

329.    As a result of Trans Union's violation of 15 U.S.C.A. § 1681e (b) and 15

U.S.C.A. §1681i, the continued presence of the inaccurate and/or materially misleading

information on the Thompsons' credit report has caused them actual damage including but not

limited to emotional distress, the unjust suppression of her FICO credit score, the payment of

increased costs of credit and insurance, loss of time, loss of credit opportunity, an informational

injury, certain out of pocket expenses, and a material risk of future financial harm if the

information is not corrected. Therefore, the Thompsons are entitled to recover actual damages

pursuant to 15 U.S.C.A. § 1681n and 1681o (West) and statutory damages pursuant to 15

U.S.C.A. § 1681n.

330.    The Thompsons are entitled to recover costs and attorney's fees from Trans Union

pursuant to 15 U.S.C.A. § 1681n and 1681o.

### COUNTS XV, XVI, XVII, XVIII: VIOLATION OF THE FCRA (EXPERIAN)
**[**15 U.S.C.A. § 1681e (b) and 1681i (West)**]**

331.    The Thompsons incorporate by reference all preceding paragraphs as though fully stated herein.

332.    Experian  negligently, or in the alternative willfully, violated 15 U.S.C.A. §1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of the Thompsons' consumer reports.

333.    Experian  also negligently and willfully violated 15 U.S.C.A. § 1681i in multiple ways including but not limited to failing to conduct a reasonable reinvestigation of the Thompsons' disputes and failing to appropriately modify inaccurate information in the Thompsons' file. *See Zahran v. Bank of Am.*, 2015 WL 4397779 (N.D. Ill. July 17, 2015)

334.    As a result of Experian's violation of 15 U.S.C.A. § 1681e (b) and 15 U.S.C.A. §1681i,  the Thompsons have suffered actual damage including but not limited to emotional distress, the unjust suppression of their FICO credit scores, the resulting payment of increased costs of credit and insurance, loss of time, loss of credit opportunities, an informational injury, certain out of pocket expenses, and a material risk of future financial harm.

335.    Experian's acts and omissions are the direct and proximate cause of the Thompsons' actual damage.


### COUNT XIX: Violation of the Discharge Injunction (11 U.S.C. § 524), Automatic Stay, and/or FRBP § 3002.1
### (Against Select)

336.    The Thompsons incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

337.    The entry of the Order of Discharge and Select's failure to provide any indication

it believed the Loan to be delinquent, required the Loan to be contractually current unless 11

U.S.C. § 524 or Federal Rule of Bankruptcy Procedure 3002.1 has been violated.

338.    Select is now seeking to collect upon pre-petition "debts" from the Thompsons, or

amounts for which it or its predecessors in interest failed to accurately apply.

339.    Alternatively, Select is now seeking to collect amounts for which requisite notice

was not provided to the Bankruptcy Court in violation of FRBP § 3002.1.

340.    Select's actions are a willful and ongoing attempt to collect a discharged debt

and otherwise frustrate the purpose of the Order of Discharge.

341.    Select's conduct constitutes a gross violation of the discharge injunction as it has

actual knowledge the Thompsons were previously involved in bankruptcy, were current or

deemed contractually current, and thus protected from any direct or indirect collection actions for

discharged debts.

342.     Select's actions were willful, and caused the Thompsons concrete injury as set

forth above, rendering it liable for punitive damages. *See, e.g*., *Romanucci & Blandin, LLC. v.

Lempesis*, 2017 WL 4402643, at 6-7 (N.D. Ill. May 4, 2017); *see, also,* 3 William L. Norton Jr.

& William L. Norton III, Norton Bankruptcy Law and Practice § 58:2 (3d ed. 2017) ("A majority

of courts also allow punitive damages in appropriate cases for a violation of the discharge

injunction although, unlike the statue governing violations of the automatic stay, punitive

damages are not specifically mentioned in Code § 524.6").

343.    The Thompsons allege that in order to carry out this provision of the Bankruptcy

Code and maintain its integrity, vital to the protection of Chapter 13 debtors who have paid as

required, this Court must permit a punitive damage instruction or impose other sanctions against Select for its willful, blatant, and continued disregard for the rule of law.

### COUNT XX: Violation of the Ind. Deceptive Consumer Sales Act, I.C. § 14-5-0.5, *et seq* (Against Select)

344.    The Thompsons incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

345.    The Indiana Deceptive Consumer Sales Act ("DCSA") is a consumer protection s statute designed to "protect consumers from suppliers who commit deceptive and unconscionable acts."

346.    The Thompsons are consumers, the Loan and servicing of the Loan is a consumer transaction, and Select is a supplier as defined by I.C. 24-5-0.5-3(A)(3), I.C. 24-5-0.5-2(a)(1), and I.C. 24-5-0.5-2(a)(1)(A)-(C).

347.    Select has contractual privity with the Thompsons as a partial assignee of the Loan. It has been assigned and has agreed to undertake obligations for servicing the Loan.

348.    Select has committed willful unfair and deceptive acts, both uncured and incurable, via the conduct alleged herein including but not limited to claiming amounts to be due which were not, by assessing fees and charges improperly, and by declaring a default and initiating the Foreclosure Case when there was not a legitimate basis to do so.

349.    The Thompsons  provided notice to Select of its willful unfair and deceptive acts via NOE No. 1, NOE No. 2, various credit reporting dispute letters, and their direct communications.

350.    Select has failed to cure its willful unfair and deceptive acts despite receiving notice, as set forth above.

### COUNT XXI: Violations of the TCPA

**(Against Select)**

351.    The Thompsons incorporate by reference and restate as though fully set forth herein all previous allegations of the Complaint.

352.    Select and/or its affiliates, agents, and/or other persons or entities acting on its behalf, placed non-emergency phone calls to the Thompsons' cellphone using an automatic telephone dialing system, and/or pre-recorded or artificial voice in violation of 47 U.S.C. § 227 (b)(1)(A)(iii).

353.    These calls occurred on or after August 1, 2019, and continued through May of 2020.

354.    Select and/or its affiliates, agents, and/or other persons or entities acting on its behalf, made these calls despite having knowledge that no consent had been given.

355.    In addition, or in the alternative, Select and/or its affiliates, agents, and/or other persons or entities acting on its behalf, continued placing these calls despite the Thompsons' demand they stop and despite their revocation of any alleged consent.

356.    As a result of the foregoing acts and violations, the Thompsons are entitled to an award of $500.00 in statutory damages for each and every call placed in violation of 47 U.S.C. § 227 (b)(1)(A)(iii) pursuant to 47 U.S.C. § 227(b)(3)(B).

357.    In the alternative, as result of the foregoing willful and knowing violations of the TCPA, the Thompsons are entitled to an award of up to $1,500.00 in statutory damages for each and every call placed in violation of 47 U.S.C. § 227 (b)(1)(A)(iii) pursuant to U.S.C. § 227(b)(3).

**PRAYER FOR RELIEF**

53

WHEREFORE, the Thompsons pray for the entry of judgment in their favor and against Select, U.S. Bank, Trans Union, Experian and Equifax for the following:

a. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against Select for the claims made in Counts II, III, V, VI, XX, XXI;

b. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against Equifax for the claims made in Counts VII, VIII, IX, and X;

c. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against Experian for the claims made in Counts XV, XVI, XVII, and XVIII;

d. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against Trans Union for the claims made in Counts XI, XII, XIII, XIV;

e. For actual damages, including emotional distress, interest, costs and reasonable attorney fees against U.S. Bank for the claims made in Counts I, IV;

f. For statutory damages of $2,000.00 against Select for each and every violation contained in Count II;

g. For statutory damages of $1,000.00 against Select for the violations contained in Count III;

h. For statutory damages of $4,000.00 against U.S. Bank the violations contained in Count IV;

i. For punitive damages against Select for the violations set forth in Counts V, VI, XIX.

j. For statutory damages of no less than $500.00 but no greater than $1,500.00 against Select for each and every violation contained in Count XXI;

k. For an Order of Contempt against Select;

l.   For all other relief deemed just and proper.

**JURY DEMAND**

Plaintiffs, Ricky and Lavonna Thompson, by counsel, hereby respectfully demand a trial by jury on all such claims that may be so tried.

Respectfully submitted,

/s/ *Travis W. Cohron*
Travis W. Cohron, No. 29562-30
**CLARK QUINN MOSES SCOTT & GRAHN, LLP**
320 N. Meridian Street, Suite 1100
Indianapolis, IN 46204
Telephone: (317) 637-1321
Fax: (317) 687-2344
tcohron@clarkquinnlaw.com